### TRACI CONSTANTINE ET AL. *v.* LOREN T. SCHNEIDER
### (AC 16454)

Foti, Landau and Healey, Js.

Argued January 26—officially released July 14, 1998

*Steven E. Arnold*, for the appellants (plaintiffs).

*Robert F. Kappes*, for the appellee (defendant).

*Opinion*

HEALEY, J. This is a medical malpractice case instituted by the plaintiffs, Traci Constantine and her husband Michael Constantine, against the defendant, Loren J. Schneider, a podiatrist, arising out of injuries to Traci Constantine's right foot.[1] The jury returned a plaintiffs' verdict of $114,000,[2] which the trial court refused to set aside or to increase with an additur.

On appeal, the plaintiffs claim that the trial court improperly (1) refused to allow them to amend and conform their complaint to their proof of damages and (2) ruled that the defendant's surveillance videotape of Traci was inadmissible because it was a privileged work product. We affirm the judgment of the trial court.

---

[1] The original complaint, dated September 16, 1992, contained two counts. The first count alleged the malpractice claim of Traci Constantine and the second count alleged the loss of consortium claim of Michael Constantine.

[2] The jury verdict awarded Traci Constantine damages of $112,000 and Michael Constantine damages of $2000.

## I

## A

The facts relating to the claim concerning the proposed amendment are as follows. After an accident in May, 1990, Traci Constantine consulted the defendant. His initial diagnosis in May, 1990, was tibial sesamoiditis with possible fracturing of the right foot. When he initially took X rays, the defendant showed them to Traci and with a pen circled the tibial sesamoid bone to show which bone was the problem. In August, 1990, he diagnosed her right front tibial sesamoid bone as chronically fractured. After a period of conservative treatment, the defendant recommended that Traci undergo a surgical removal of the tibial sesamoid bone of her right foot. She agreed and the defendant performed the surgery. In doing so, however, he removed the fibular sesamoid bone and not the tibial sesamoid bone.[3]

After the surgery, Traci continued to have much pain. Her mobility was quite difficult even though she was receiving physiotherapy and attempting to wear an orthotic device on her right foot as prescribed by the defendant. On September 21, 1990, she returned to the defendant's office and saw the defendant's associate. Among other things, the associate took X rays of her right foot, which revealed the absence of the fibular sesamoid. She visited the defendant's office several times thereafter, including December 17, 1990, when the defendant took X rays. Some time later, Traci went to the defendant's office and picked up the rest of her file as well as the original X rays of her foot taken by the defendant. On January 1, 1991, Traci went through her file and paperwork, including the consent forms, and looked at the picture that the defendant had drawn of the bones of the foot. She noticed that the defendant

---

[3] The tibial sesamoid and fibular sesamoid are two small bones located just beneath and just behind the great toe joint.

had circled the outside bone, which was the fibular sesamoid, and he had written that this was the bone removed. She believed that the wrong bone had been removed. The next day she had an appointment for physical therapy at the defendant's office, and she planned to confront the defendant. The defendant, however, was not present, and Traci spoke to the defendant's associate about her concerns. At that time, she showed the associate, inter alia, the original X rays of May, 1990. The next day the defendant telephoned Traci, acknowledged that he had made a mistake and apologized. At that time, he told her that if she wanted to have the correct bone removed, he would to do it free of charge.[4] That was the last conversation that Traci had with the defendant.

Shortly thereafter, Traci contacted Peter Barnett,[5] a Hartford orthopedic surgeon, to discuss her case, and she brought him her file and X rays to see if he would perform the surgery to remove the tibial sesamoid bone. Barnett performed the surgery and, according to Barnett, after that surgery Traci had very little pain, except at the surgical site. She still experienced difficulty with her mobility in her daily activities, and she was prescribed handmade orthotics to wear in both shoes. Barnett treated Traci until January, 1992.

Traci saw two orthopedic surgeons and one podiatrist at various times after she discontinued treatment with Barnett.[6] From August 18, 1992, until August 31, 1995, Traci did not receive either medical or podiatric treatment. The podiatrist was treating her at the time of trial and testified as her expert witness. He testified about his treatment, her pain, her potential for future surgery,

---

[1] At the trial, the plaintiff's counsel conceded that there was no claim that the defendant had fraudulently withheld information from Traci.

[5] Barnett did not testify at the trial, nor was he deposed.

[6] Of those, only the podiatrist testified at the trial. The reports of the others were in evidence as exhibits.

the type of employment she could expect to perform and her mobility.

## B

We turn now to the plaintiffs' request to amend their original complaint (1992 complaint) on July 16, 1996, the first day of trial. The 1992 complaint alleged, inter alia, that the causes of Traci's postsurgical right foot pain and discomfort and the February 8, 1991 surgical removal of the tibial sesamoid bone by an orthopedic surgeon were the defendant's (1) diagnosis that Traci was suffering from tibial sesamoiditis with a possible fracture of the right foot, (2) recommendation after a period of conservative treatment that she undergo a surgical procedure known as a tibial sesamoidectomy, (3) performance of surgery on September 18, 1990, (4) informing her on January 3, 1991, that he had mistakenly removed the fibular sesamoid bone instead of the tibial sesamoid bone and (5) improper removal of the fibular sesamoid bone. The original complaint specifically alleged the following in paragraph nine: "The Plaintiff's injuries, losses and damages were proximately caused by the carelessness and negligence of the Defendant, Loren J. Schneider, in one or more of the following ways:

"a. In that he removed the fibular sesamoid instead of the tibial sesamoid from the Plaintiff's right foot, which necessitated a second surgical procedure resulting in the complete removal of both sesamoid bones;

"b. In that he failed to perform an adequate and thorough inspection of the operative site during surgery to ensure that the correct bone would be removed;

"c. In that he failed in his continuing duty as a podiatrist to advise the Plaintiff in a timely fashion of the

cause of the Plaintiff's persistent postsurgical complaints of right foot pain and discomfort." The complaint then alleged her claims as to the damages sustained as the result of the carelessness and negligence of the defendant.[7]

The proposed amended complaint (1996 complaint)[8] substantially tracked the negligence allegations of the 1992 complaint.[9] The allegations of negligence in the 1996 complaint were, however, not only greater in number but also more expansive. Those allegations were set out in paragraph ten as follows: "The Plaintiff's injuries, losses and damages were proximately caused by the carelessness and negligence of the Defendant, Loren J. Schneider, his agents, servants and/or employees, in one or more of the following ways:

"a. In that he failed to provide the Plaintiff with additional and alternative medical care and treatment to resolve or minimize her right foot pain;

"b. In that he failed to seek or obtain expert radiological and other medical opinions to assist him with determining the correct and proper diagnosis and treatment of her right foot pain;

"c. In that he failed to perform an adequate and thorough review of her medical chart and X rays in preparation for and prior to the surgery that he had recommended be performed;

---

[7] These claims included the pain, discomfort and swelling of her right foot, the course and type of her treatment, her ability to use her right foot properly, the risk of future surgery, permanency, future physical, mental and emotional pain, impairment of her earning capacity and employment opportunities, and the curtailment of her ability to carry on life's activities.

[8] The plaintiffs did not file any prior motion to amend their original 1992 complaint.

[9] The defendant's brief concedes the similarity of the 1992 and 1996 complaints: "There is no substantial difference between the original complaint and the proposed amended complaint."

"d. In that he removed the fibular sesamoid bone instead of the tibial sesamoid bone from the Plaintiff's right foot;

"e. In that he failed to perform an adequate and thorough inspection of the operative site during and at the surgery to ensure that the correct sesamoid bone was to be removed;

"f. In that he failed to perform an adequate and thorough inspection of the postsurgical interoperative X ray that he took of her right foot immediately after his surgery to discover that he had removed the wrong sesamoid bone from her right foot;

"g. In that he failed in his continuing duty as a podiatrist to discover and disclose to the Plaintiff in a timely fashion his surgical malpractice as being the resultant cause of the Plaintiff's persistent postsurgical problems with her right foot pain, discomfort and disability;

"h. In that after he had discovered his surgical malpractice, he failed to timely disclose to the Plaintiff that he had removed the wrong sesamoid bone from her right foot; and

"i. In that his failure to timely disclose to the Plaintiff his surgical malpractice prevented her from timely receiving the medical care and treatment required because of the further injury he had caused to her right foot." The allegations as to Traci's damages, as set out in her 1996 complaint, essentially tracked her damages allegations in the 1992 complaint.

The plaintiffs sought to file the 1996 complaint "to make their allegations more specific and more complete." The plaintiffs argued in the motion to amend that the allegations of negligence contained in the proposed paragraph ten of the 1996 complaint make more specific that which was alleged in paragraph nine of the 1992 complaint, which indicated that it was not exclusive in

its allegations. The plaintiffs maintain that it was only during voir dire that defense counsel acknowledged that the defendant unintentionally took out the incorrect bone and that therefore there was no prejudice to the defendant from the proposed amendment.[10]

Defense counsel objected to the amendment and argued, "I'm going to admit liability. I'm going to admit that . . . in the original complaint the first allegation of negligence, that my client is responsible for removing the wrong bone. And for that wrong bone. And on that basis, I'd ask that the motion be denied."

At the outset of the trial, the court denied the motion to amend, stating that "since [the defendant was] admitting liability . . . I don't think it's necessary to allege any more about negligence," and "[i]nsofar as any of these statements made in your amended complaint, any evidence you can put in that would be relevant to damages, you certainly will be allowed to do that."[11] This ruling proscribed the allegations of any negligence other than those contained in the 1992 complaint and held that the 1992 complaint was general enough to allow the plaintiffs to present evidence of damages as to the allegations of negligence made in that complaint.

As the trial proceeded, the plaintiffs urged a construction of the 1992 complaint to which the defendant objected as asserting a new cause of action on a matter not within the allegations of the 1992 complaint. The plaintiffs' counsel argued that the defendant was negligent in recommending the second surgery to remove

---

[10] The jury had been selected and sworn before the plaintiffs offered the 1996 complaint.

[11] In ruling on the motion to amend, the trial court also stated: "All right. As I stated in chambers, since [the defendant is] admitting liability I don't think it's necessary to allege any more about negligence. Insofar as any of these statements made in your amended complaint, any evidence you can put in that would be relevant to damages, you certainly will be allowed to do that. But I don't think it's necessary to amend the complaint, and I sustain the objection."

the tibial sesamoid bone and that Traci relied on the defendant in undergoing that second operation.[12] He stressed Traci's reliance on the defendant's advice concerning the second surgery by Barnett.[13] This reliance claim is also developed at some length in the plaintiffs' brief.

The defendant argued at trial and in this court that this reliance claim is nowhere alleged in either the 1992 complaint or the 1996 complaint. The defendant argues that the plaintiffs, in advancing their reliance claim, were calling on the defendant to defend against an entirely new claim, which would have been extremely unfair and prejudicial to him.

The reliance claim does introduce a new claim of negligence that is not evident, even on a liberal reading of the 1992 complaint. The plaintiffs argue that it can hardly be said to work any surprise or prejudice on the

---

[12] During a colloquy between the court and counsel, plaintiffs' counsel stated: "I'm claiming that Dr. Schneider should never have recommended its surgical removal, that Traci relied on his medical expertise and recommendation, and requested an orthopedic surgeon to remove it because she at least wanted what she thought was a more trained doctor. . . ."

Later, during the same colloquy, the following occurred:

"[Plaintiffs' Counsel]: I'm claiming that Dr. Schneider, the only doctor involved in this case, was negligent in recommending the surgical removal of the tibial sesamoid and that Traci has suffered extreme emotional distress to know that it may never have had to have been taken out in the first place. And she relied on Dr. Schneider in the first place to take out the one he said he should take out when he took out the wrong one and he—

"The Court: It's not in the case.

"[Plaintiffs' Counsel]:—relied on Dr. Schneider in the second place to ask a doctor to take out what he said should be taken out. It most certainly is in the case and I—

"The Court: I'm sorry. I disagree with you."

[13] Specifically, the plaintiffs' counsel stated: "And in reliance on his medical advice and opinion it led [Traci] to believe that it was necessary to have it taken out. She went to an orthopedic surgeon and said, 'Please, take it out,' because she was under the impression she had to have it taken out.

"The Court: You mean—do you mean to tell me that the orthopedic surgeon would just take out a bone because [Traci] said so?

"[Plaintiffs' Counsel]: Yup."

defendant because he had notice of their "more specific damage claims from the parties' alternative mediation and numerous pretrial conferences."[14] The defendant's answer to this claim is that if this were so, the plaintiffs could quite easily have amended their complaint long before the presentation of evidence was to begin.

We are aware that liability was admitted and that this new claim goes to the scope of the evidence that could come in on damages. Because it was a new claim and first raised at trial, the matter of surprise and prejudice, if any, to the defendant must be considered. "The purpose of the complaint is to limit the issues to be decided at the trial of a case and is calculated to prevent surprise." *Farrell* v. *St. Vincent's Hospital,* 203 Conn. 554, 557, 525 A.2d 954 (1987); see *Francis* v. *Hollauer,* 1 Conn. App. 693, 694, 475 A.2d 326 (1984). "As long as the pleadings provide sufficient notice of the facts claimed and the issues to be tried and do not surprise or prejudice the opposing party, we will not conclude that the complaint is insufficient to allow recovery." *Normand Josef Enterprises, Inc.* v. *Connecticut National Bank,* 230 Conn. 486, 496, 646 A.2d 1289 (1994); *O'Brien* v. *Coburn,* 39 Conn. App. 143, 147, 664 A.2d 312 (1995). Ballentine defines "surprise" as "[t]he condition in which a party to an action finds himself, contrary to his reasonable expectation, through no fault or neglect of his own, and to his probable injury." Ballentine's Law Dictionary (3d Ed. 1969).

It would have been quite unfair and prejudicial to have required the defendant to defend against this new claim. We can hardly overlook the circumstance that although the defendant did not admit liability until the trial, he had admitted to Traci over five years earlier

---

[14] The plaintiffs' brief does not state that the reliance claim, as spelled out at trial and on appeal, was specifically made at those times.

that he had removed the wrong bone.[15] The plaintiffs cannot, at the time of trial, inject a claim of negligence into this action without having pleaded it. We recognize that " '[a] change in, or an addition to, a ground of negligence or an act of negligence arising out of the single group of facts which was originally claimed to have brought about the unlawful injury to the plaintiff does not change the cause of action. . . . It is proper to amplify or expand what has already been alleged in support of a cause of action, provided the identity of the cause of action remains substantially the same, but where an entirely new and different factual situation is presented, a new and different cause of action is stated.' " (Citations omitted.) *Sharp* v. *Mitchell*, 209 Conn. 59, 71–72, 546 A.2d 846 (1988), quoting *Gallo* v. *G. Fox & Co.*, 148 Conn. 327, 330, 170 A.2d 724 (1961); *Gurliacci* v. *Mayer*, 218 Conn. 531, 547, 590 A.2d 914 (1991); *Connecticut National Bank* v. *D'Onofrio*, 46 Conn. App. 199, 208, 699 A.2d 237, cert. denied, 243 Conn. 926, 701 A.2d 657 (1997). Our courts have "faced claims that certain new amendments alleged new causes of actions with varying outcomes." *Sharp* v. *Mitchell*, supra, 74.

The reliance claim advanced by the plaintiffs does affect the quality of the notice given by the fact situation as pleaded in the 1992 complaint. That claim was simply not pleaded. Even if we assume that such reliance sounds in malpractice, it would require that the defendant, to defend against it, gather different facts, witnesses and evidence. See generally *Gurliacci* v. *Mayer*, supra, 218 Conn. 548–49; *Sharp* v. *Mitchell*, supra, 209 Conn. 72–73. It would probably have required the testimony of Barnett, who performed the second surgery, even though his records were already in the case.[16] At

---

[15] This admission in January, 1991, was also well over one year before this action was instituted.

[16] An examination of Barnett's records indicates that he stated: "Apparently, the lateral [fibular] sesamoid was inadvertently removed and the

the trial, the defendant suggested that if evidence of damages were allowed on the reliance claim, he might have to bring in an expert witness.

Further, we have already said that the reliance claim was not pleaded, and we have great difficulty in concluding that there is a fair factual nexus between the reliance evidence and the allegations of the 1992 complaint. This was a case in which the plaintiffs sought to inject matters "foreign to the issues in the original complaint, which required proof of facts which the defendant could not meet during the normal course of the trial." *Wright* v. *Coe & Anderson, Inc.*, 156 Conn. 145, 156, 239 A.2d 493 (1968). The plaintiffs claim on appeal that the trial court abused its discretion in refusing to allow them to amend and conform their complaint to their proof. We disagree.

"Under the statutes and rules of practice, the court may in its discretion, in a proper case, allow the filing of amendments to pleadings before, during and after trial." Id., 155; see *Moore* v. *Sergi*, 38 Conn. App. 829, 835–37, 664 A.2d 795 (1995). "Amendments should be made seasonably. Factors to be considered in passing on a motion to amend are the length of delay, fairness to the opposing parties and the negligence, if any, of the party offering the amendment." (Internal quotation marks omitted.) *Connecticut National Bank* v. *Voog*, 233 Conn. 352, 364, 659 A.2d 172 (1995). A trial court's ruling on a motion of a party to amend its complaint will be disturbed only on the showing of a clear abuse

symptoms were over the medical [tibial] sesamoid." His records fail to mention the defendant. They also do not suggest that Traci ever told him that the defendant "recommended" the second surgery. Barnett did not testify at the trial. Traci testified that at the end of her treatment with Barnett, he told her to come back if she needed him and to call him if she wanted to see him. She never went back to see him after January, 1992, and part of her reason for that was that she was "somewhat" dissatisfied with him.

of discretion. See *Antonofsky* v. *Goldberg*, 144 Conn. 594, 597, 136 A.2d 338 (1957); *Connecticut Bank & Trust Co.* v. *Wilcox*, 3 Conn. App. 510, 510, 490 A.2d 95 (1985), aff'd, 201 Conn. 570, 518 A.2d 928 (1986). " 'The essential tests are whether the ruling of the court will work an injustice to either [party] and whether the granting of the motion will unduly delay a trial.' " *Moore* v. *Sergi*, supra, 836, quoting *Smith* v. *New Haven*, 144 Conn. 126, 132, 127 A.2d 829 (1956). Again, such discretion may be exercised as to amendments that involve matters pleaded in the complaint sought to be amended. "It is fundamental in our law that the right of a plaintiff to recover is limited to the allegations in his complaint. *Kawasaki Kisen Kaisha, Ltd.* v. *Indomar, Ltd.*, 173 Conn. 269, 272, 377 A.2d 316 (1977) . . . . 'Facts found but not averred cannot be made the basis for a recovery.' *Malone* v. *Steinberg*, 138 Conn. 718, 721, 89 A.2d 213 (1952) . . . ." (Citations omitted.) *Francis* v. *Hollauer*, supra, 1 Conn. App. 695; see *Normand Josef Enterprises, Inc.* v. *Connecticut National Bank*, supra, 230 Conn. 496; *Seymour Housing Authority Tenants Assn.* v. *Housing Authority*, 18 Conn. App. 393, 404 n.10, 558 A.2d 1002 (1989). " 'The trial court is in the best position to assess the burden which an amendment would impose on the opposing party in light of the facts of the particular case.' " *Wassell* v. *Hamblin*, 196 Conn. 463, 466–67, 493 A.2d 870 (1985); *Tedesco* v. *Julius C. Pagano, Inc.*, 182 Conn. 339, 341–42, 438 A.2d 95 (1980); *Eisenbach* v. *Downey*, 45 Conn. App. 165, 181, 694 A.2d 1376, cert. denied, 241 Conn. 926, 696 A.2d 1264 (1997). The trial judge has a unique vantage point in ruling on such a motion, which entitles the decision to great weight on appeal. See *Bielaska* v. *Waterford*, 196 Conn. 151, 154, 491 A.2d 1071 (1985); *Antonofsky* v. *Goldberg*, supra, 599.

The plaintiffs presented the trial court with a motion to amend their complaint to conform with proof of

allegations that they had not originally pleaded. The court denied that motion and did not abuse its discretion in so ruling.

The plaintiffs also claim that the trial court's initial ruling that their 1992 complaint was sufficient to permit proof of all their damages claims should have permitted admission of evidence of the plaintiffs' reliance argument. The plaintiffs claim that the trial court improperly excluded that evidence. The plaintiffs are incorrect. The trial court allowed evidence of damages that was within the allegations of the 1992 complaint. It excluded only the reliance evidence. The plaintiffs' claim that this was "inconsistent with its initial rulings" is without merit. Accordingly, there was no abuse of discretion in denying the plaintiffs' motion to amend their complaint to conform with their proof and in excluding the plaintiffs' damages proof on their reliance claim.

## II

The plaintiffs next claim that the trial court improperly ruled that the defendant's surveillance videotape of Traci, which the plaintiffs offered as evidence, was privileged work product of the defense and, therefore, inadmissible. The defendant made a videotape of Traci when she walked in high-heel shoes outside her home and at church. The plaintiffs claim that they sought to have the videotape admitted into evidence at the trial because it would demonstrate the true nature and extent of Traci's right foot condition and disabilities, and would assist Traci's expert in explaining to the jury the nature, extent and future medical requirements of Traci's right foot caused by the defendant's malpractice.[17] After a lengthy argument, the trial court found

[17] There was lengthy argument outside the presence of the jury as to how this videotape came to be made. Defense counsel insisted that he authorized the tapes to be made in preparation of his defense of the case, that neither the defendant's insurance carrier, adjuster nor "anybody else" but he made the arrangements to have the videotape made, that he told the plaintiffs'

that the videotape was the work product of the defendant's counsel and that there had been no waiving of confidentiality by the defendant's counsel in allowing the plaintiffs' counsel to view it. The plaintiffs claim on appeal that the trial court's improper ruling prevented them "from *rehabilitating* Traci's credibility regarding the truthfulness and seriousness of her right foot injuries with the *unimpeachable* videotape surveillance." (Emphasis added.) They also claim that because of the exclusion of this evidence, "the jury was permitted to accept the defendant's counsel's arguments attacking the [plaintiffs'] damages claims without the *unimpeachable* videotape evidence obtained by the defendant's own representative, which corroborated the [plaintiffs'] damages claims." (Emphasis added.)

"To be reversible, evidentiary error must be both wrong and harmful. *Sanderson* v. *Steve Snyder Enterprises, Inc.*, 196 Conn. 134, 142, 491 A.2d 389 (1985) . . . ." (Citation omitted.) *Sokolowski* v. *Medi Mart,*

counsel that he had such a tape, that if the plaintiffs' counsel wanted to see it he would allow him to do so, that the plaintiffs' counsel said that he did want to see it and that defense counsel did "hand" it to him to do so. The defense counsel further stated that he did so "as a common courtesy from one lawyer to another" and that he "never waived its confidentiality."

The plaintiffs' counsel maintained that the "defendant's insurance carrier in Seattle . . . authorized him as plaintiffs' counsel to, in fact, obtain [the] videotape and to view it. And . . . specifically to view it with his client . . . ." The plaintiffs' counsel stated that the defendant's insurance representative in Seattle "authorized [defense counsel] to deliver the original videotape . . . [to be given to the plaintiffs' counsel] so that [he] could view it." He did view it with Traci and her expert, the podiatrist.

Defense counsel responded that he had made the decision to give the plaintiffs' counsel the tape and that, insofar as he knew, the plaintiffs' counsel never asked the approbation of the Seattle representative to do so and that the defendant's counsel never gave his permission to show the tape to Traci or her expert.

There was apparently no motion filed by defense counsel for a protective order as to the videotape. There is also no claim made by the plaintiffs that they ever filed any pretrial motion for discovery for the disclosure and production of any such evidence. The trial court file does not reveal that the plaintiffs *ever* filed any motion for disclosure and production in this case.

*Inc.*, 24 Conn. App. 276, 282, 587 A.2d 1056 (1991); see *Manning* v. *Michael*, 188 Conn. 607, 611, 452 A.2d 1157 (1982); *Saphir* v. *Neustadt*, 177 Conn. 191, 201, 413 A.2d 843 (1979). "The appellant bears the burden of establishing the specific harmfulness of the error. See *Braun* v. *Edelstein*, 17 Conn. App. 658, [661] 554 A.2d 1102, cert. denied, 211 Conn. 803, 559 A.2d 1138 (1989)." *Sokolowski* v. *Medi Mart, Inc.*, supra, 282. In a civil case, where the appellant has the burden of proving that the evidentiary ruling is both wrong and harmful, the standard to be used for determining harmfulness is whether the evidentiary ruling " 'would likely affect the result' "; *Swenson* v. *Sawoska*, 215 Conn. 148, 153, 575 A.2d 206 (1990); *Manning* v. *Michael*, supra, 611; *DeCarufel* v. *Colonial Trust Co.*, 143 Conn. 18, 21, 118 A.2d 798 (1955); and the determination of that issue is to be found in the record. *Swenson* v. *Sawoska*, supra, 153; see *DeCarufel* v. *Colonial Trust Co.*, supra, 21.

We turn first to the question of whether the exclusion of the videotape was "wrong" under the first prong of the wrong and harmful test. The plaintiffs claim that the videotape was to be used for "rehabilitating" Traci's credibility, that it contained "unimpeachable" evidence that "corroborated" the plaintiffs' evidence, that it was "a very important piece of credible evidence," and that even if it was attorney work product, the defendant had waived the confidentiality of it. The defendant objected to its admissibility on the ground that it was his work product and that its confidentiality had not been waived.

We believe that the videotape did not qualify as the defendant's work product in this case.[18] In making that determination, we note that "the work-product rule only

[18] The defendant's sole objection to its admission was that the videotape was a work product. See *Stanley Works* v. *New Britain Redevelopment Agency*, 155 Conn. 86, 98, 230 A.2d 9 (1967); *Salvatore* v. *Hayden*, 144 Conn. 437, 443, 133 A.2d 622 (1957).

applies in pretrial disclosure. It is not an exclusionary rule of evidence." *Stanley Works* v. *New Britain Redevelopment Agency*, 155 Conn. 86, 97, 230 A.2d 9 (1967); see generally 1 E. Stephenson, Connecticut Civil Procedure (2d Ed. 1970 & Cum. Sup. 1982) § 138 (g), pp. 598–99. Any objection to the admissibility of evidence as work product "is not an appropriate objection at the trial stage." *Stanley Works* v. *New Britain Redevelopment Agency*, supra, 98. Therefore, we conclude that the trial court's excluding the videotape on the ground that it was the work product of an attorney was wrong.

This, however, does not end the inquiry. There remains the issue of whether the exclusion was harmful, that is, whether it " 'would likely affect the result.' " *Swenson* v. *Sawoska*, supra, 215 Conn. 153; *Manning* v. *Michael*, supra, 188 Conn. 611; *DeCarufel* v. *Colonial Trust Co.*, supra, 143 Conn. 21. Our courts have stressed that "[t]o be harmful, an error must be so fundamental and material that it may work an injustice." *Bell* v. *Bihary*, 168 Conn. 269, 273, 362 A.2d 963 (1975).

In arguing for the admission of the videotape, the plaintiffs insisted that the work product rule applies only to pretrial discovery and is not an exclusionary rule of evidence.[19] It is significant that the plaintiffs never moved before the trial for production of the videotape. Moreover, the plaintiffs do not claim that the

[19] The defendant's counsel argues that given the plaintiffs' stated position that the work product rule applies only to pretrial disclosure matters, the trial court's ruling excluding it is not subject to appellate review. In so arguing, he reasons that because there was no pretrial discovery request and, thus, no record of any granting or denial of any such motion, the plaintiffs have not discharged their duty, as appellants, to provide an adequate record for review under Practice Book § 4061, now Practice Book (1998 Rev.) § 60-5. See *Carpenter* v. *Carpenter*, 188 Conn. 736, 739, 453 A.2d 1151 (1982). We do not agree with the defendant. We believe that fairness requires that we consider the claim and that the plaintiffs' failure to seek pretrial disclosure is an element to be taken into account in deciding the harmfulness of the exclusion.

defendant was under any duty to have produced it voluntarily. It is true that the plaintiffs were apparently unaware of the existence of the videotape until several months before trial. Even then, however, they did not move to obtain it by discovery. It had been handed over before the trial to their counsel by the defendant's counsel, but at the trial they argued that the work product rule was confined to pretrial disclosure and, in any event, that the defendant's counsel had waived any confidentiality attached to it. It seems to us that it is not now wholly fair or just for the plaintiffs to be advantaged by their failure to utilize the pretrial discovery rules to obtain the videotape.

We also address the representations of the plaintiffs' counsel in making the initial offer of the videotape during Traci's direct testimony when he referred to the videotape as "unimpeachable" evidence that "corroborated" the plaintiffs' damages claims, "verified" Traci's foot disabilities and her pain and suffering, and was "a very important credible piece of evidence." "It is well settled that representations of counsel are not, legally speaking, 'evidence.' " *Cologne* v. *Westfarms Associates*, 197 Conn. 141, 154, 496 A.2d 476 (1985); *Evans* v. *Warden*, 29 Conn. App. 274, 278, 613 A.2d 327 (1992); *State* v. *Carsetti*, 12 Conn. App. 375, 379, 530 A.2d 1095, cert. denied, 205 Conn. 809, 532 A.2d 77 (1987). Moreover, despite their representations about the reliability and value of the videotape as evidence, the plaintiffs do not explain why they did not ever move the trial court to view the videotape in the absence of the jury before ruling on its admissibility. We also note that the jury *never* heard *any* evidence of the existence of the videotape, let alone its contents.

Additionally, the videotape was offered by the plaintiffs at a time when Traci had not even finished her *direct* examination. The plaintiffs claimed that it would "rehabilitate" her credibility. Her credibility had not yet

been impeached. For the trial court to admit it at that time would have been akin to permitting a prior consistent statement to enhance her testimony before any impeachment had taken place. That, of course, is not generally allowed. See *State* v. *McCarthy*, 179 Conn. 1, 18, 425 A.2d 924 (1979); *Mei* v. *Alterman Transport Lines, Inc.*, 159 Conn. 307, 315–16, 268 A.2d 639 (1970); 4 J. Wigmore, Evidence (Chadbourn Rev. 1972) § 1124, p. 255; 81 Am. Jur. 2d, Witnesses §§ 1011 and 1012 (1992). "[T]he general rule is that a party cannot strengthen the testimony of his own witness by showing that he has made previous statements to the same effect as his testimony . . . ." *Palmer* v. *Hartford Dredging Co.*, 73 Conn. 182, 188, 47 A. 125 (1900); see *State* v. *Brown*, 187 Conn. 602, 607–608, 447 A.2d 734 (1982); *Mei* v. *Alterman Transport Lines, Inc.*, supra, 316; *State* v. *Suckley*, 26 Conn. App. 65, 72, 597 A.2d 1285, cert. denied, 221 Conn. 901, 600 A.2d 1028 (1991).[20]

As stated above, the standard to be used for determining whether an improper evidentiary ruling was harmful is whether the ruling " 'would likely affect the result.' " *Swenson* v. *Sawoska*, supra, 215 Conn. 153. In this case, liability was admitted, so the improper ruling could not affect that branch of the case. That leaves its effect, if any, on the issue of damages. It is possible that admission of the videotape might have affected the damages in the plaintiffs' favor by demonstrating more forcefully

---

[20] At the very end of the case, after the plaintiffs and the defendant had put on all of their evidence and just before both parties rested, plaintiffs' counsel said to the court: "And in light of all the evidence having been presented, now I, one last time, move that the videotape be allowed as a full exhibit." No new claims for its admission were made nor were earlier ones fleshed out in the light of what may have happened at the trial since the original offer. This was the only other time that the plaintiffs offered the videotape at the trial. The court adhered to its earlier exclusion of the videotape. This brief offer by the plaintiffs can hardly be said to have alerted the trial court that the exhibit was again claimed on the grounds initially stated.

their damages claims. We, however, cannot rely on counsel's statements that the videotape contained "unimpeachable evidence" that "corroborated" their damages claims, that it "verified" Traci's foot disabilities and her pain and suffering, and that it was "a very important piece of credible evidence." "Representations by counsel are not 'evidence' *upon which an appellate court can rely* when reviewing the findings of the trial court." (Emphasis added.) *State* v. *Carsetti,* supra, 12 Conn. App. 379.

On the other hand, we also cannot say that admitting the videotape might have resulted in a verdict lower than the $114,000 verdict that the jury returned. Again, the plaintiffs did not move or suggest that the trial court view it. Also, it is puzzling that the defense counsel would voluntarily, as he did, turn over before the trial such apparently damaging evidence. An appellate court, in deciding whether an improper evidentiary ruling is likely to affect the result reached, must use common sense when reviewing the record. See *DeJesus* v. *Yogel,* 404 Mass. 44, 48, 533 N.E.2d 1318 (1989). In a case such as this, whether such a ruling is likely to affect the result reached should be based on whether it is likely to affect the result *adversely* to the party against whom the improper ruling was made. It would be speculative for this court on this record to conclude how the admission of the videotape was "likely to affect the result." Under the circumstances in this record, we conclude that on appeal, the plaintiffs have not sustained their burden of showing the harmfulness of the improper ruling and, therefore, justice does not require a new trial.

The judgment is affirmed.

In this opinion the other judges concurred.