Howard T. Hogan, J.
This is a proceeding in eminent domain brought by the Long Beach Urban Renewal Agency to acquire title to certain parcels of improved property in the City of Long Beach for urban renewal purposes.
Title vested on April 3,1968.
The subject property is identified on the Nassau County Tax Maps as Section 59, Block 80, Lots 10, 11, 12, 13, 46, 47, 48, 49 and 50. Lots 10,11,12,13, 49 and 50 comprise Damage Parcel 137 and Lots 46, 47 and 48 comprise Damage Parcel 141-B. Lots 10 through 13 are located on the easterly side of National Boulevard with a total frontage thereon of 90 feet. The depth of each of these lots is 100 feet. Lots 46 through 50 are located on the westerly side of Centre Street with a total frontage thereon of 100 feet. These lots also have a depth of 100 feet each.
Centre Street is a north-south thoroughfare and is the street immediately to the east of National Boulevard. The rear lines of Lots 10, 11 and 12 are contiguous to the rear lines of Lots 48, 49 and 50. The subject property therefore contains 19,000 square feet and runs through from National Boulevard to Centre Street.
The property was improved on the vesting date with a retail lumber yard, millwork shop, hardware sales and lumber storage facility. It was serviced by all utilities. A spur of the Long Beach branch of the Long Island Rail Road was located within 200 feet and was used by the lumber yard for receipt of shipments of lumber. The three buildings on the premises were erected in 1951 by the owners and operators of the lumber yard and were specifically designed for the various aspects of the business.
The main building, with a ground floor area of approximately 3,340 square feet and a mezzanine for storage containing 1,000 square feet, was a one-story masonry and frame structure with concrete foundation and floor slab containing office, display area, lumber storage areas, wood working area, boiler room and lavatory. Two smaller buildings were used for storage of lumber and millwork materials. Of these, the larger was also used for some shopwork. This was a two-story masonry and frame structure with concrete foundation and reinforced concrete slab floor containing some 3,000 square feet of ground floor area and 2,280 square feet of second floor or mezzanine area. The third building was primarily used for storage. It was a two-story frame building with concrete footings and foundation walls below grade and a compacted loam floor. This structure contained 1,900 square feet of ground floor area and 1,900 square feet of second floor or mezzanine area. Both storage buildings contained heavy *261 timber framing and structural members and storage bins designed for lumber storage. The smaller of the two buildings was designed so that fork-lift trucks could enter the building and unload material on either of the two levels located therein. The balance of the property contained site improvements including paving, fencing, and underground systems for water service, sanitary purposes, electric service and drainage.
At the outset, an interesting question is presented to the court relating to the valuation of these parcels as a single economic unit. The evidence demonstrates conclusively that both Damage Parcels 137 and 141-B were contiguous and were operated as and constituted a single economic entity. The problem, however, stems from the fact that the fee ownership of the various lots was in different parties. Thus, while there is unity of use and contiguity, there is, ostensibly, no unity of title.
The nine lots which make up the subject property were all owned, at one time, by Mr. Gordon Both, principal stockholder in Centre Millwork & Supply Co., Inc. (Centre). Lots 12, 13, 49 and 50 were acquired prior to 1949; Lots 10 and 11 were acquired in 1950 and Lots 46, 47 and 48 were acquired in 1954. Lots 12, 13, 49 and 50 were conveyed by Mr. Both in 1949 to Centre in return for stock distributed as follows: 75% to Gordon Both and 25% to his two sons. Subsequent to the conveyance to Centre, Mr. Both acquired Lots 10 and 11. In 1951, the structures and improvements described before were built by Mr. Both and Centre for the conduct of Centre’s business. At that time, two of the six lots (10 and 11) were owned individually by Mr. Both. Thereafter, in 1954, Mr. Both personally acquired Lots 46, 47 and 48 which were paved and fenced and used in connection with the lumber business conducted by Centre. In 1955, Mr. Both conveyed Lots 10, 11, 46, 47 and 48 to his wife, Katherine E. Roth.
During all the years of Mr. Roth’s ownership of Lots 10, 11, 46, 47 and 48 and Mrs. Roth’s ownership of them, Centre paid all taxes and water and sewer charges, maintained all property and fire insurance and never paid any rent to the record owner. During all this time Centre was the fee owner of Lots 12, 13, 49 and 50 but conducted its business on all nine lots.
The court finds that, based upon the evidence and the factual situation herein, there was such a degree of close control and ownership exercised by Centre over all the lots so as to satisfy the requirements of unity of title to permit all nine lots to be valued as one economic unit, which they undoubtedly were. The court is of the opinion that the constitutional mandate of just compensation must prevail over the niceties of legal title. We
*262 are not unmindful of the cases in this State which have developed and discussed the requirements of unity of title, use and contiguity but find that they all dealt with partial takings and the issue of severance damages to' remainders in different fee ownerships and have no applicability to the factual situation in the case at bar. (Kessler v. State of New York, 21 A D 2d 568; Guptill Holding Corp. v. State of New York, 20 A D 2d 832, 43 Misc 2d 631, affd. 23 A D 2d 434; Red Apple Rest v. State of New York, 46 Misc 2d 623, affd. 27 A D 2d 417; York Coll. Urban Renewal Stages I, II, N. Y. L. J., July 13,1971, p. 11, col. 8.)
The court further finds that the only available and truly proper method to be used to value the subject property is the cost or summation approach. This method consists of adding the depreciated value of the improvements (sound value) to the value of the land as determined from an examination of comparable sales of vacant land. The evidence clearly shows that the subject property was a special purpose property and in a sense unique. The buildings were designed and built for the specific purposes for which they were used and were ideally adapted to such uses. Both real estate experts agreed that there was a limited market for this type of property. There were no comparable sales or rentals of this type of lumber sales and millwork facility or, for that matter, any lumber yard. After the taking, the claimant could find no suitable buildings in which to carry on its business and had to erect another building for this purpose. For these reasons the appraisers for both parties relied upon the cost approach but each used a capitalization of income method as a guide and test of the values found by summation. Needless to say, these experts held widely divergent views of the value of the subject premises.
Claimant’s real estate expert valued Damage Parcels 137 and 141-B as one. Petitioner, on the other hand, valued each parcel separately and sought the advice of three experts, only one of whom testified and then only with respect to Damage Parcel 137. His appraisal for Damage Parcel 141-B, however, was introduced in evidence and is before the court, as is an appraisal of both parcels prepared by petitioner’s third expert.
The experts for each side analyzed comparable sales in arriving at their land values. Claimant’s expert found a land value of $3 per square foot, or $57,000 for this 19,000 square foot property.
Petitioner’s expert, who testified, found a land value of $1.85 per square foot, or $24,000 for the 13,000 square feet of Damage Parcel 137. His land value for Damage Parcel 141-B, con *263 taining 6,000 square feet, is also $1.85 per square foot. The value for this parcel is therefore $11,100, giving a total land value of $35,100 for the entire property. The appraisal report of petitioner’s third expert who was not called indicates a land value of $2.80 per square foot for each damage parcel, or a total of $54,300 for the entire 19,000 square foot property.
The court finds that claimant’s sales are the most comparable. The analysis and adjustment of these sales establishes that the value of the land of the subject property is $3 per square foot. The court therefore finds the land value to be $57,000.
With respect to the improvements, the claimant called upon a licensed professional engineer who made a detailed quantity survey and cost breakdown of the materials used in building the structures and site improvements on the subject property. To these calculations he added all of the necessary costs incident to construction such as architect’s and engineer’s fees, permits, tests and general contractor’s costs. He depreciated each item of cost where necessary based upon the conditions he observed. He calculated the sound value of the improvements to be $92,500 which was reduced by stipulation to $85,000 after deducting certain items of fixtures for which the claimant had already been compensated. Claimant’s real estate expert adopted the valuation of the improvements given by the engineer.
Petitioner’s real estate expert, who was not an engineer, testified to valuation of the improvements based upon estimated cost per square foot of similar buildings culled from certain building guides and reporting services. It appears from his testimony, however, that he did not give sufficient consideration to the mezzanine or second floor areas of the buildings, nor to the yard and site improvements either on Parcel 137 or on Parcel 141-B which he valued as vacant land. He found a sound value of $31,700.
This court is of the opinion that the particularized study of specific buildings is far more desirable than a generalized report. (Matter of Bowlmg Corp. of Plainview [Board of Assessors of Nassau County], N. T. L. J., June 4,1969, p. 35, col. 2.) The court therefore adopts claimant’s appraisal based upon such specific study except as to certain items characterized by the engineer as general conditions and fees which appear to be inordinately high. The court finds that the sums set forth for permits, fees, lab tests, rental and other miscellaneous contractor’s costs should be reduced by a total of $9,500 which results in a sound value of the improvements of $75,500.
*264 The court finds, therefore, that the claimant is entitled to an award of $132,500 as follows:

DAMAGE PARCELS 137 and 141-B:

LAND
$3 per square foot for 19,000 square feet... $ 57,000
BUILDINGS AND IMPROVEMENTS....... 75,500
$132,500