FRANK FRANC ET AL. *v.* BETHEL HOLDING
COMPANY ET AL.
(AC 15764)

Lavery, C. J., and Schaller and Peters, Js.

Argued February 26—officially released October 22, 2002

*Jerome A. Mayer*, for the appellant-appellee (named defendant).

*T. Stevens Bliss*, for the appellees-appellants (plaintiffs).

### Opinion

LAVERY, C. J. The defendant Bethel Holding Company appeals from the judgment, rendered after a trial to the court, awarding $270,000 in compensatory damages and $100,000 in punitive damages to the plaintiffs, Frank

Franc and Anna Franc, for nuisance and the loss of lateral support for their properties.[1] The plaintiffs have filed a cross appeal from that judgment. The defendant claims on appeal that (1) the court's award of compensatory damages was improper because it was based (a) on a valuation of two separately owned properties as if they were one unified parcel and (b) on an assumption that one property was landlocked, which was inconsistent with another finding of the court, (2) the court improperly allowed the plaintiffs to amend their complaint during the trial, (3) the court improperly rejected the defendant's statute of limitations defense and (4) the court's punitive damages award was improper because (a) the evidence was insufficient to establish that the defendant acted recklessly and (b) the award was in excess of the plaintiffs' attorney's fees and costs. In their cross appeal, the plaintiffs claim that the court improperly awarded damages rather than the injunctive relief they requested and improperly ordered that a safety fence be erected on their property instead of on the defendant's property. We agree that the court's punitive damages award was improper, but otherwise disagree with both parties' claims and affirm the judgment of the court.

The following facts and procedural history are relevant to the appeal and cross appeal. The parties own various parcels of real property in Bethel that border one another. The defendant owns about 5.5 acres of commercial property on which a retail nursery operates. Frank Franc (Frank) owns a fifteen acre parcel

---

[1] Two cases brought by the plaintiffs against the defendant Bethel Holding Company were consolidated for trial, one an action for damages for loss of lateral support in which Bethel Holding Company and Pawling Savings Bank were the defendants, and the other a contract action, in which there were additional defendants. This appeal and cross appeal are from the trial court's judgment as to the lateral support action only. Because Pawling Savings Bank is not a party to this appeal, we refer in this opinion to Bethel Holding Company as the defendant.

(parcel) that is situated to the south of the defendant's property. The parcel is undisturbed woodland that is zoned for residential use. To the east of the defendant's property is a narrow strip of commercially zoned land (strip). It is about fifty feet in width and 350 feet in length, comprising about 0.4 acres. The strip abuts the parcel on its southern end and Stony Hill Road, also known as Route 6, on its northern end. At the time of the events giving rise to this litigation, the strip was owned by Anna Franc (Anna), who is Frank's sister. After the litigation commenced, Anna quitclaimed the strip to herself and Frank. To the south of the parcel is additional property (homestead) on which Frank, Anna and their brother, Ambrose, long have resided. The three siblings together own the homestead. The homestead's southern border is Walnut Hill Road.

Construction of the nursery commenced on the defendant's property in 1986. That construction involved major excavation and blasting work that resulted in the loss of lateral support for both the parcel and the strip. The defendant or its agent excavated to the boundaries with the plaintiffs' properties and in some cases encroached onto those properties. The resultant topography is such that a twenty to twenty-five foot sheer, almost vertical cliff exists along much of the boundary between the strip and parcel and the defendant's property. The cliff runs about 150 feet along the western boundary of the strip and about 300 feet along the northern boundary of the parcel. The slopes of the cliff are unstable and continue to ravel and erode. It is expected that such raveling and erosion will continue until the slopes eventually stabilize. The tops of the slopes will move farther inward onto the plaintiffs' properties as this occurs, as much as twenty-five feet.

In July, 1988, the plaintiffs initiated an action alleging nuisance and loss of lateral support for the parcel and

the strip. They sought damages and injunctive relief.[2] After a trial held from December, 1994, to February, 1995, the court awarded the plaintiffs $270,000 in compensatory damages[3] and $100,000 in punitive damages, but denied the requested injunctive relief. Additional facts and procedural history will be set forth as necessary for the resolution of the issues.

## I

The defendant claims first that the court improperly awarded the plaintiffs compensatory damages of $270,000 for nuisance and the loss of the lateral support of their properties. It argues that the award was improper because it was based on a valuation of the strip and the parcel together, as if they were one unified property. The defendant claims further that the award was based on an assumption that the parcel is landlocked, which assumption is inconsistent with the court's finding that the parcel may be accessed via the homestead. We disagree with each of these arguments.

## A

The defendant claims that the court improperly based its compensatory damages award on a valuation of the parcel and the strip together, although at the time the

---

[2] Pursuant to their July 1, 1992 amended complaint, the plaintiffs sought "[a]n order by the court to the defendant and its agents to restore the plaintiffs' property in such a manner as to restore lateral support; correct outstanding zoning violations; eliminate nuisance conditions; abate erosion; eliminate the risk of injury to persons and property; provide appropriate landscaping; and hold the plaintiffs and their successors in interest in their property harmless from future adverse consequences of the said conduct of the defendant and its agents . . . ."

[3] The court determined that preexcavation, the plaintiffs' land, as a potential residential development, was worth $300,000 and that postexcavation, it retained only $40,000 of its value for use as a wood lot. To the $260,000 representing diminution in value, the court added $25,000 for the construction of a safety fence and subtracted $15,000, the amount that the plaintiffs would have expended to render the property suitable for development, to arrive at the compensatory damages award of $270,000.

damage was inflicted, Frank owned the parcel and Anna owned the strip. It argues that the court, without explicitly stating so, employed an "assemblage" theory of valuation that is improper where there is no unity of title between the properties to be valued. We agree that the court used an assemblage analysis, but disagree that it was improper.

The following additional facts are pertinent. The court arrived at its compensatory damages figure by comparing the value of the plaintiffs' properties before and after the loss of lateral support and making certain adjustments. See footnote 3. In its memorandum of decision, the court acknowledged that at the time of the defendant's excavation and the resultant damage, Anna was the owner of the strip and Frank was the owner of the parcel. It noted, however, that Frank had bargained for the purchase of the strip with the purpose of acquiring access to the parcel from Route 6. The court apparently credited Frank's testimony that he had intended to share ownership of the parcel at the time he arranged for its purchase, but somehow it had been titled in Anna's name only. The court noted further that after the lateral support litigation commenced, Anna and Frank "corrected" the ownership status with a quitclaim deed so that they now appear together as coowners of the strip. The court proceeded to determine the preexcavation value of the plaintiffs' two properties based on their highest and best use. It found that use to be development of the parcel as a residential subdivision, with access thereto provided by a road that could have been built across the strip leading to Route 6. On the basis of that contemplated use and expert valuation testimony, the court found that the properties, prior to being damaged, together were worth $300,000. Nowhere in its decision did the court state that it was taking an "assemblage" approach to valuation.

In an action for damages to real property, "[t]he basic measure of damages . . . is the resultant diminution in value . . . . In order to assess the diminution in value, however, the trial court must first determine the value of the property, both before and after the injury has occurred. . . . In actions requiring such a valuation of property, the trial court is charged with the duty of making an independent valuation of the property involved. . . . [N]o one method of valuation is controlling and . . . the [court] may select the one most appropriate in the case before [it]. . . . Moreover, a variety of factors may be considered by the trial court in assessing the value of such property. [T]he trier arrives at his own conclusions by weighing the opinions of the appraisers, the claims of the parties, and his own general knowledge of the elements going to establish value, and then employs the most appropriate method of determining valuation. . . . The trial court has broad discretion in reaching such conclusion, and [its] determination is reviewable only if [it] misapplies or gives an improper effect to any test or consideration which it was [its] duty to regard. Such determinations are findings of fact, and therefore must stand unless clearly erroneous." (Citations omitted; internal quotation marks omitted.) *Ratner* v. *Willametz*, 9 Conn. App. 565, 584–85, 520 A.2d 621 (1987).

The defendant claims, and we agree, that the court effectively invoked the doctrine of assemblage when it valued the parcel based on the assumption that it would have been used in conjunction with the strip. "The doctrine of assemblage applies when the highest and best use of separate parcels involves their integrated use with lands of another. Pursuant to this doctrine, such prospective use may be properly considered in fixing the value of the property if the joinder of the parcels is reasonably practicable. If applicable, this doctrine allows a property owner to introduce evidence showing

that the fair market value of his real estate is enhanced by its probable assemblage with other parcels." 4 P. Nichols, Eminent Domain (3d Ed. Rev. 2000, P. Rohan & M. Reskin, eds.) § 13.02 [9].

Our Supreme Court recently accepted the applicability of the assemblage doctrine for valuation purposes in the context of a condemnation case. See *Commissioner of Transportation* v. *Towpath Associates*, 255 Conn. 529, 767 A.2d 1169 (2001). In *Towpath Associates*, as in this case, it appears that the concept of assemblage was implicit in the trial court's analysis, rather than explicitly applied. Id., 547–48. According to the Supreme Court, "[t]he fact that the most profitable use of a parcel can be made only in combination with other lands does not necessarily exclude that use from consideration if the possibility of combination is reasonably sufficient to affect market value. . . . There must be a reasonable [probability] that the owner could use this tract together with the other [parcels for such] purposes or that another could acquire all lands or easements necessary for that use." (Internal quotation marks omitted.) Id., 548.

"[I]f a prospective, integrated use is the highest and best use of the land, can be achieved only through combination with other parcels of land, and combination of the parcels is reasonably probable, then evidence concerning assemblage, and, ultimately, a finding that the land is specially adaptable for that highest and best use, may be appropriate. . . . The consideration of a future change in the use of the parcel taken and the effect that such a change may have on the market value at the time of the taking has long been recognized in Connecticut, and the use of property in conjunction with other parcels may affect value if it is shown that such an integrated use reasonably would have occurred in the absence of the condemnation." (Citation omitted; internal quotation marks omitted.) Id., 549–50. Con-

versely, "[a] finding that the property is adaptable for its highest and best use is not warranted if the parcels' adaptability depends upon speculative or remote possibilities that the lands may be assembled for that use." Id., 550.

In *Towpath Associates*, the Supreme Court reversed the trial court's assessments of damages awards to two separate defendants for the taking of their properties by eminent domain, concluding that the evidence did not support a finding that absent the taking, the two properties would have been assembled and devoted to the use contemplated by the trial court when it valued the property to assess damages. The properties at issue consisted of small parcels situated on opposite banks of a river, each of which housed an abandoned stone bridge abutment and railroad track bed. Id., 531. Relying on testimony that the highest and best use of each property was as a bridge site, connecting the abutments, the trial court valued each property and its abutment based on that specialized adaptability. The Supreme Court disagreed with that approach because on the record presented, the possibility that either the two property owners or some third party purchaser of their parcels, other than the condemnor, would in the near future construct a bridge thereon was not reasonably probable but rather, " 'remote and speculative.' " Id., 553.

It was not necessary for the *Towpath Associates* court to reach the issue before us today, that is, whether unity of title between the parcels sought to be valued together is a necessary prerequisite to application of assemblage doctrine. The court did note that courts in other jurisdictions took differing approaches, some requiring common ownership between the parcels and others not. Id., 549 n.13. Our review of the case law from other jurisdictions convinces us that the better rule is not to impose an absolute requirement of com-

mon ownership for parcels sought to be assembled for valuation purposes.[4] Rather, a court, in deciding whether it is appropriate to employ an assemblage analysis in a particular case, should consider all the circumstances surrounding the proposed combination, including the ownership status of the parcels. If the combination of parcels is reasonably probable and the prospective, integrated use is not speculative or remote, assemblage analysis is a proper valuation approach. Although common ownership of the parcels sought to be integrated would be a factor weighing in favor of a finding that assemblage analysis is appropriate, its presence or absence is not necessarily dispositive of the inquiry.

In *Clarmar Realty Co.* v. *Redevelopment Authority*, 129 Wis. 2d 81, 383 N.W.2d 890 (1986), the Supreme Court of Wisconsin explicitly rejected the requirement of unity of ownership as a necessary prerequisite to assemblage. The court reviewed the federal constitutional case that provided the roots of assemblage doctrine, which did not limit its application to commonly owned parcels. Id., 88–89, citing *Olson* v. *United States*, 292 U.S. 246, 254–55, 54 S. Ct. 704, 78 L. Ed. 1236 (1934). It also considered prior analogous case law allowing consideration of prospective uses of land as factors affecting market value, as long as those uses were reasonably likely to have occurred. *Clarmar Realty Co.*

---

[4] We note that commentators differ as to what is the majority rule. According to a prominent eminent domain treatise, "[c]ourts in jurisdictions allowing consideration of assemblage generally admit such evidence if combination with other parcels for a more profitable use is reasonably likely, whether or not the owner of the property owns the other parcels." 4 P. Nichols, supra, § 13.02 [9]. An annotation and legal encyclopedia, however, state that "it is well settled that unity of ownership must exist for there to be 'assemblage value . . . .'" Annot., 8 A.L.R.4th 1202, 1204 (1981); see also 26 Am. Jur. 2d, Eminent Domain § 330 (1996). Our own review of the case law discloses that courts in fact take varying approaches to the issue and, as such, the latter characterization is inapt.

v. *Redevelopment Authority,* supra, 89–91. The court "conclude[d] that the traditional application of assemblage, which does not contain [the] limitation [of unity of ownership], better serves the overriding purpose of [compensating deprived property owners] because it permits property owners to establish a legitimate element of the fair market value of the property, i.e., its value in conjunction with adjacent land to which the owners may or may not hold title." Id., 92–93.

Similarly, the Alabama Supreme Court, in holding that unity of ownership was not determinative as to whether assemblage doctrine could apply, explained that "[t]he mere fact that the adjacent property is held in another ownership does not make their combined use speculative and imaginative without other supporting factors. . . . The bargaining power of the individual seller would certainly be greater if he owned his tract and the adjacent tract, but that does not make testimony [regarding the] possibility of the use of both tracts in combination inadmissible." (Citation omitted.) *State* v. *Long,* 344 So. 2d 754, 760 (Ala. 1977). We find the reasoning of the Wisconsin and Alabama courts persuasive.

Furthermore, we have located decisions of several of our sister courts that do not directly so hold, but where it is apparent from the facts, that in those jurisdictions unity of title is not a necessary requirement for the application of assemblage doctrine. See, e.g., *Ex parte Weldon,* 495 So. 2d 1121, 1122 (Ala. 1986); *Santa Clara* v. *Ogata,* 240 Cal. App. 2d 262, 268, 49 Cal. Rptr. 397 (1966); *Indianapolis Dept. of Metropolitan Development* v. *Heeter,* 171 Ind. App. 119, 126–27, 355 N.E.2d 429 (1976); *Cain* v. *Topeka,* 4 Kan. App. 2d 192, 193, 603 P.2d 1031, review denied, 227 Kan. 927 (1980); *Lafayette* v. *Richard,* 549 So. 2d 909, 911–12 (La. App. 1989); *United Gas Pipe Line Co.* v. *Becnel,* 417 So. 2d 1198, 1202–1203 (La. App. 1982); *Monmouth* v. *Hilton,* 334 N.J. Super. 582, 590–92, 760 A.2d 786 (App. Div. 2000),

cert. denied, 167 N.J. 633, 772 A.2d 935 (2001). Thus, there is considerable support for a more flexible approach. Those courts generally analyze the issue within the "reasonable probability" framework.

Conversely, cases requiring unity of ownership suggest that it acts only as a rough proxy for the reasonable probability inquiry. As explained by the Georgia Court of Appeals, "[t]he purpose of the unity requirements . . . is to establish that an integrated use of the various parcels is 'reasonably probable.' Without at least substantial unity of ownership and some indication of unity of use, the proposed assemblage is entirely speculative." *Oglethorpe Power Corp.* v. *Lewis*, 215 Ga. App. 671, 672, 452 S.E.2d 167, cert. denied, 215 Ga. App. 913 (1994). There also is concern that "treating separately owned parcels of land as a single tract might result in a windfall of sorts to the party who has interest in one parcel but not in the other." *Kessler* v. *State*, 21 App. Div. 2d 568, 570, 251 N.Y.S.2d 487 (1964).[5]

Although those concerns are well placed, we believe that a trial court, in a case where assemblage analysis is proposed, will best be able to make a determination as to whether a potential integrated use was sufficiently

---

[5] There also is some indication that courts requiring unity of ownership in assemblage cases are applying factors applicable in cases where the issue is whether a property owner is entitled to severance damages for a partial taking; although the two doctrines are somewhat related they are conceptually distinct and different considerations should apply. *Matter of Long Beach Urban Renewal Agency*, 67 Misc. 2d 259, 262, 324 N.Y.S.2d 158 (1971). Severance damages may be awarded in condemnation cases for the diminished value of a parcel retained by the condemnee after the taking of another parcel owned by the condemnee, whereas assemblage is the increment or enhancement of value accruing to two or more lots by virtue of their consequent adaptability for greater use. See generally 26 Am. Jur. 2d, Eminent Domain §§ 330 (plottage or assemblage), 380 (severance damages) (1996); annot., 8 A.L.R.4th 1202, 1207–16 (assemblage as valuation factor in eminent domain cases); annot., 95 A.L.R.2d 887 (1964) (unity of ownership necessary for severance damages in eminent domain cases); J. Eaton, Real Estate Valuation in Litigation (1982) pp. 65, 183.

likely to have affected market value by carefully considering *all* of the surrounding circumstances, rather than being constrained by a rigid factor bound approach. We agree that a party ought not receive excess compensation when its land is condemned or damaged; however, we are equally convinced that it is necessary to have a rule flexible enough to ensure that compensation is fully adequate, given the reality of the situation, so that a party deprived of its land does not suffer a shortfall. A general rule requiring that the proposed assemblage was reasonably probable rather than speculative and remote has the advantage of being able to meet both concerns.

We note finally that assemblage analysis, although most commonly applied in the area of eminent domain, also has been employed to value property in other contexts. See, e.g., *Meakin* v. *Steveland, Inc.*, 68 Cal. App. 3d 490, 502–503, 137 Cal. Rptr. 359 (1977) (valuation of city property being sold to private party); *Matter of Finchley, Inc.* v. *Tax Commission*, 2 N.Y.2d 1005, 1006, 143 N.E.2d 349, 163 N.Y.S.2d 616 (1957) (valuation of property for tax assessment); *Erlanger* v. *New York Theatre Co.*, 206 App. Div. 148, 150–52, 200 N.Y.S. 696 (valuation of corporate property for purpose of valuing stock), modified on other grounds sub nom. *In re Erlanger*, 237 N.Y. 159, 142 N.E. 571 (1923); *People* v. *O'Donnel*, 130 App. Div. 734, 736, 115 N.Y.S. 509 (1909) (property tax assessment).

In both eminent domain proceedings and in actions for damages to real property, a trial court enjoys a large degree of discretion in valuing the subject property. See, e.g., *Commissioner of Transportation* v. *Towpath Associates*, supra, 255 Conn. 541; *Ratner* v. *Willametz*, supra, 9 Conn. App. 584–85. We can discern no reason why a factor affecting the fair market value of real property in the former context should be inapplicable in the latter. As previously stated, in an action for dam-

ages to real property, "[n]o one method of valuation is controlling and . . . the [court] may select the one most appropriate in the case before [it]." (Internal quotation marks omitted.) *Ratner* v. *Willametz*, supra, 584. In this matter, the plaintiffs argued at trial that the damage to their properties was such that it amounted to a "de facto taking" so that valuation methods employed in condemnation cases were appropriate. Given the magnitude of the damage to the plaintiffs' land, we consider the analogy apt.

We turn now to the court's analysis in this case. Our review of the record convinces us that the court's assemblage approach to valuation was not improper because there was ample evidence to show that the potential integration of the parcel and the strip for the enhanced use as a residential development and an access road thereto was reasonably probable and not speculative or remote. Frank testified that both he and Anna had been born at the homestead and lived together there all of their lives. He testified further that the siblings participated in joint endeavors such as raising organic produce and selling wood, and that they shared the proceeds thus derived. Frank explained that he specifically sought to purchase the strip so as to provide access to the parcel and that he would not have bought the parcel had he not been able to acquire the strip. There is no indication from anything in the record that Anna would have refused to cooperate in the development of the parcel by disallowing use of the strip.

Furthermore, at the time of the damage, the parcel already was zoned for residential use. There was expert testimony that the area was particularly desirable for development due to its proximity to a planned sewer line, several retail establishments and the interstate highway system. Additionally, although the parties introduced conflicting opinion testimony on the matter, the court reviewed the regulations governing commer-

cially zoned areas and determined that they would not have prevented utilization of the strip as an access road to the parcel. The court thus had a strong basis on which to conclude that it was reasonably probable that Anna and Frank would have collaborated on the development of the land had it not been damaged and, further, that there were no regulatory barriers to such development.[6]

[6] We note here that even if we were to agree with the dissent's interpretation of a footnote in the trial court's memorandum of decision as evidencing its reliance on an unarticulated "deed correction" theory, which we do not, it is well settled that this court may affirm a correct result in the trial court, although it was based on improper reasoning. See, e.g., *Flagg Energy Development Corp.* v. *General Motors Corp.*, 244 Conn. 126, 151, 709 A.2d 1075 (1998); *Herrmann* v. *Summer Plaza Corp.*, 201 Conn. 263, 274, 513 A.2d 1211 (1986); *Favorite* v. *Miller*, 176 Conn. 310, 317, 407 A.2d 974 (1978); *Kalas* v. *Cook*, 70 Conn. App. 477, 485, 800 A.2d 553 (2002); *Amsden* v. *Fischer*, 62 Conn. App. 323, 327, 771 A.2d 233 (2001).

Nonetheless, we believe the court's rationale for valuing the parcel and the strip as a unified parcel is to be found not in the footnote on which the dissent has fixated, but in an extended colloquy at trial between the court and counsel wherein in the propriety of valuing separately owned properties together was discussed. A hypothetical posed by the court and counsels' responses to that hypothetical demonstrate that the court's valuation of the plaintiffs' properties was based on reasoning similar to that articulated in this opinion:

"[The Court]: Let's assume that this was a claim between Donald Trump and—who is another big famous developer? Let's assume that they each had their eye on this piece for potential development years ago and one of them happened to luck into a certain circumstance where he bought the fifty foot strip and the other one bought the back lot. And then each of the parcels was damaged through an excavation. Would they not each be permitted to be separate plaintiffs arguing with all kinds of charts and graphs that they hoped to present to each other and to the various commissions that they each suffered a damage based upon its highest, best, ultimate use?

"[Defendant's Counsel]: That's correct, Your Honor. But highest and best use is different if we assume separate ownership.

"[The Court]: What I'm saying is, just as we may be entertaining legally the prospect of a road going on there and a prospect of a road being power rated and fitting a zoning reg[ulation], should we not or can we not tolerate the prospect of a unified endeavor of two separate landowners?

"[Defendant's Counsel]: My argument is that under the law that that's so far-fetched that it doesn't fall into the evaluation, but that's for Your Honor to—

On the basis of the foregoing, we conclude that the court's valuation of the subject properties, on the basis of their potential use as a unified parcel suitable for residential development, was not clearly erroneous.

## B

The defendant also claims that the court's compensatory damages award was improper because it was based on the assumption that the parcel now is landlocked due to the damage to the strip. It argues that this assumption was improper because it is inconsistent with an implicit finding of the court, that is, that the

"[The Court]: Well, I don't think it's far-fetched if we have a brother and a sister . . . ."

\* \* \*

"[Plaintiffs' Counsel]: Your Honor, we will be presenting the testimony of an appraiser as to this very issue about the evaluation of the property.

"[The Court]: As a unified piece?

"[Plaintiffs' Counsel]: Yes, Your Honor, by virtue of the fact that this is a brother, sister situation with unity of use.

"[The Court]: Do you know if there's any evidence that you might be presenting as to whether this brother and this sister ever did anything together for—

"[Plaintiffs' Counsel]: Did anything together?

"[The Court]: In the nature of an entreprencurial transaction?

"[Plaintiffs' Counsel]: Very definitely, Your Honor. . . ."

Conversely, in our review of the entire record, we have found nothing to indicate that the court reasoned that the quitclaim deed conveying ownership from Anna to herself and to Frank had any retroactive, reformative effect.

Furthermore, regarding the facts that the dissent accuses the majority of improperly finding on appeal, we note that the facts on which we rely were in fact found by the trial court, as reflected in its memorandum of decision. Specifically, the court found the following: "Plaintiffs are brother and sister who have always lived together on a piece of land they call the 'homestead' "; "[Frank and Anna have engaged in] a lifetime of cohabitation and joint endeavors"; "Mr. Franc sought other access for [the] residential fifteen acre parcel and, to that end, bargained with [third parties] for [the strip]"; [p]laintiffs' residential [fifteen] acre plot is and was zoned R-80 (single-family dwellings on 80,000 square foot lots)"; and "the court finds not only no barrier to a zone change for the commercial strip, but finds sufficient credibility in the testimony to conclude that such permission would be obtained."

plaintiffs may access the parcel via the homestead. We are not persuaded.

The defendant's argument essentially challenges the court's factual finding that the parcel is landlocked for purposes of residential development. This court will not disturb the trial court's factual findings unless they are clearly erroneous. See *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221–22, 435 A.2d 24 (1980). The defendant does not argue that access to the parcel is available over the strip, but rather, that it is available over the homestead. It bases this claim on the court's finding that postexcavation, the parcel had a residual value of $40,000 for continued use by the Franc family as a wood lot, accessible via the homestead, which fronts on Walnut Hill Road.

We reject this argument because the court's finding that the parcel is landlocked for the purpose of its highest and best use, that is, as a residential development, is supported by the evidence, and it is of no consequence that the plaintiffs, as neighboring landowners, still may access it for a greatly diminished use. This is because, "under the general rule of property valuation, fair [market] value, of necessity, regardless of the method of valuation, takes into account the *highest and best* value of the land. . . . The 'highest and best use' concept, chiefly employed as a starting point in estimating the value of real estate by appraisers, has to do with the use that will most likely produce the highest market value, greatest financial return, or the most profit from the use of a particular piece of real estate." (Citation omitted; emphasis added; internal quotation marks omitted.) *Metropolitan District* v. *Burlington*, 241 Conn. 382, 390, 696 A.2d 969 (1997).

The defendant's argument is logically flawed because it assumes that because the plaintiffs still may enter the parcel to collect wood, the parcel is not "land-

locked" for its highest and best use as a residential development. Clearly, different factors apply when considering each type of use, and it was not inconsistent for the court to conclude that although the parcel was landlocked for development purposes, it retained some residual value to the plaintiffs. The record supports the court's finding as to the relevant question, that is, whether the parcel was landlocked for purposes of its highest and best use, which is as a residential development.

First, there was ample evidence that the damage to the strip is such that it no longer can support a road. Next, Frank testified that he, Anna and their brother, Ambrose, together own the homestead and that Ambrose would not agree to allow access over the homestead to the parcel. The defendant did not present any evidence to dispute this and does not argue that Frank and Anna could compel Ambrose to allow the construction of a road through the homestead. Frank stated also that the town would not have permitted such access, and the defendant does not direct us to any evidence that suggests otherwise. We conclude that the court's finding that the parcel is landlocked for purposes of residential development properly was based on the foregoing evidence and, therefore, was not clearly erroneous.

II

The defendant next claims that the court improperly allowed the plaintiffs to amend their complaint during the trial, resulting in injustice to the defendant. We disagree.

The following additional procedural history is relevant. On February 1, 1995, after resting their case, the plaintiffs requested leave to amend their complaint to conform to the evidence they had presented. See Practice Book § 10-62. Specifically, they sought to add alle-

gations that the defendant, in damaging their property, had acted wantonly, wilfully and recklessly. The court deferred ruling on the plaintiffs' request, but at the end of the trial allowed the amendment over the defendant's objection.

"Our standard of review of the [plaintiffs'] claim is well defined. A trial court's ruling on a motion of a party to amend its complaint will be disturbed only on the showing of a clear abuse of discretion. . . . Whether to allow an amendment is a matter left to the sound discretion of the trial court. [An appellate] court will not disturb a trial court's ruling on a proposed amendment unless there has been a clear abuse of that discretion. . . . It is the [defendant's] burden in this case to demonstrate that the trial court clearly abused its discretion." (Citation omitted; internal quotation marks omitted.) *Mastrolillo* v. *Danbury*, 61 Conn. App. 693, 696, 767 A.2d 1232 (2001).

"A trial court may allow, in its discretion, an amendment to pleadings before, during, or after trial to conform to the proof." *Wilburn* v. *Mount Sinai Medical Center*, 3 Conn. App. 284, 287, 487 A.2d 568 (1985). "Factors to be considered in passing on a motion to amend are the length of the delay, fairness to the opposing parties and the negligence, if any, of the party offering the amendment." (Internal quotation marks omitted.) *Wagner* v. *Clark Equipment Co.*, 259 Conn. 114, 128, 788 A.2d 83 (2002). "The essential tests are whether the ruling of the court will work an injustice to either the plaintiff or the defendant and whether the granting of the motion will unduly delay a trial." *Wilburn* v. *Mount Sinai Medical Center*, supra, 287.

The defendant argues that in adding allegations of recklessness, the plaintiffs improperly were raising a new cause of action. In an amended complaint, "[i]t is proper to amplify or expand what has already been

alleged in support of a cause of action, provided the identity of the cause of action remains substantially the same, but where an entirely new and different factual situation is presented, a new and different cause of action is stated." (Internal quotation marks omitted.) *Constantine* v. *Schneider*, 49 Conn. App. 378, 388, 715 A.2d 772 (1998). "A cause of action is that single group of facts which is claimed to have brought about an unlawful injury to the plaintiff and which entitles the plaintiff to relief. . . . A right of action at law arises from the existence of a primary right in the plaintiff, and an invasion of that right by some delict on the part of the defendant. The facts which establish the existence of that right and that delict constitute the cause of action." (Internal quotation marks omitted.) *Wagner* v. *Clark Equipment Co.*, supra, 259 Conn. 129.

We have held that a trial court did not abuse its discretion in allowing the plaintiff to amend the pleadings to conform with the proof where the plaintiff added recklessness allegations to an action sounding in negligence; *Eisenbach* v. *Downey*, 45 Conn. App. 165, 181–82, 694 A.2d 1376, cert. denied, 241 Conn. 926, 696 A.2d 1264 (1997); as has our Supreme Court. *Gurliacci* v. *Mayer*, 218 Conn. 531, 546–49, 590 A.2d 914 (1991). In those cases, both claims arose from the same facts, those involving an automobile accident. Compare *Barrett* v. *Danbury Hospital*, 232 Conn. 242, 262–64, 654 A.2d 748 (1995) (medical malpractice and negligent and intentional infliction of emotional distress claims stated different causes of action where former based on treatment incident, latter based on hospital's subsequent actions). We think the amendment in this case is similar to those in *Eisenbach* and *Gurliacci* in that it stems from the same factual situation as the plaintiffs' earlier claims, i.e., the wrongful excavation, and amplifies those claims only as to the egregiousness of the defendant's actions. Furthermore, the operative complaint

throughout trial included a request for punitive damages, which request contemplates reckless conduct. The court's ruling therefore was proper.

The defendant also argues that it "was prejudiced by the new complaint because it had no opportunity to cross-examine witnesses, to retain experts or to present witnesses on the issue" of recklessness. It claims that because the court deferred ruling on the request, "there was no way for the defendant to address the new issues raised by the amendment." We are not convinced.

"If an amendment is allowed at trial and the opponent wants to raise an abuse of discretion issue on appeal, he should immediately move for a continuance in the trial in order to defend against the new issue. In *Smith* v. *New Haven* [144 Conn. 126, 127 A.2d 829 (1956)], because the defendant failed to move for either a postponement of the trial or a delay, the Supreme Court rejected the abuse of discretion claim." *Moore* v. *Sergi*, 38 Conn. App. 829, 838 n.6, 664 A.2d 795 (1995); see also *Wilson* v. *R.F.K. Corp.*, 19 Conn. App. 548, 550, 563 A.2d 738 (1989); *Wilburn* v. *Mount Sinai Medical Center*, supra, 3 Conn. App. 287–88. Additionally, in *All American Pools, Inc.* v. *Lato*, 20 Conn. App. 625, 630, 569 A.2d 562 (1990), in which the trial court, after allowing the plaintiff to amend its complaint, offered the defendants the opportunity to present additional evidence and they declined, we concluded that there was no prejudice.

In this case, the plaintiffs filed their request to amend promptly after resting their case.[7] After the defendant objected, the court specifically inquired of the parties

---

[7] The defendant characterizes the request to amend as "outrageously late" because it was filed several years after the original complaint in the case. This overlooks the fact that the plaintiffs made the request because they believed that a variance between the pleadings and proof arose *during* the trial.

whether it was possible to proceed with the planned testimony without the court ruling on the plaintiffs' request. The defendant consented to moving forth with the evidence. Subsequently, when discussing scheduling matters midway through the defendant's evidence, the court asked the defendant's counsel whether he planned to present additional evidence if the court allowed the amendment. The defendant's counsel replied that he probably would call only one witness and no expert witnesses. One week later, after the court heard argument on the plaintiffs' request, it again suggested that the defendant could present additional witnesses if the amendment were allowed. The defendant's counsel replied: "I have pretty much decided that I am going to rest after [the current witness], no matter what happens with this. . . ." The following day, the court ruled to allow the amendment, and the defendant's counsel stated that other than "raising special defenses based on the statute of limitations . . . I don't have anything new to add." He did not request a continuance. Given that the defendant had several opportunities to present additional evidence and consciously chose to forgo them, its claim on appeal that it was prejudiced is unavailing.

Because the plaintiffs' amended complaint did not raise a new cause of action and because the defendant was not deprived of the chance to present additional evidence in response, we conclude that the court did not abuse its discretion in allowing the amendment.

### III

The defendant also argues that the court improperly rejected its special defense that the plaintiffs' allegations of wanton, wilful or reckless conduct were time barred. We disagree.

In response to the plaintiffs' February, 1995 amendment to their complaint, the defendant interposed a

special defense, namely, that the plaintiffs' allegations of wanton, wilful and reckless disregard were barred by the applicable statute of limitations. See General Statutes §§ 52-577, 52-584.

Amendments relate back to the date of the original complaint unless they allege a new cause of action. *Sharp* v. *Mitchell*, 209 Conn. 59, 71–75, 546 A.2d 846 (1988). "This doctrine is akin to rule 15 (c) of the Federal Rules of Civil Procedure, which provides in pertinent part: '(c) RELATION BACK OF AMENDMENTS. Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading.' " *Giglio* v. *Connecticut Light & Power Co.*, 180 Conn. 230, 239–40, 429 A.2d 486 (1980).

"Our relation back doctrine provides that an amendment relates back when the original complaint has given the party fair notice that a claim is being asserted stemming from a particular transaction or occurrence, thereby serving the objectives of our statute of limitations, namely, to protect parties from having to defend against stale claims . . . ." (Internal quotation marks omitted.) *Barrett* v. *Danbury Hospital*, supra, 232 Conn. 264.

On the basis of our conclusion in part III A that the plaintiffs' amended complaint did not raise a new cause of action, but rather amplified the allegations in their prior complaint, we conclude that the allegations in the amended complaint related back to the earlier complaint and thus were not time barred.

IV

The defendant's final claims attack the propriety of the court's punitive damages award. The defendant claims that the award was improper because there was

insufficient evidence to establish the defendant's reckless conduct and because the award was in excess of the plaintiffs' attorney's fees and costs. We disagree with the first claim but agree with the second.

## A

The defendant argues that the punitive damages award was improper because there was no evidence showing that it acted recklessly. We are not convinced.

The court in its memorandum of decision stated that it was "not in doubt that reckless disregard was eminently displayed throughout" the excavation. It articulated the basis of its finding of recklessness, in part, as follows: "The blasting and excavation work so rather precisely cuts up to plaintiffs' boundaries, so consistently throughout their length as to negate the possibility of inadvertence. As credible engineering testimony at trial stated, the surest way to protect the lateral support of one's neighbor is to stay back. Nor can it be believed that [the] defendant misunderstood where boundaries lay; first to blast while so ignorant would probably also constitute reckless disregard; here, however, there were negotiations regarding certain walls and trees on the plaintiffs' land (largely the subject of [the contract case; see footnote 1]) bespeaking a familiarity with the parameters of the plaintiffs' land."

"We have previously held that in order to award punitive damages, evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights." *West Haven* v. *Hartford Ins. Co.*, 221 Conn. 149, 160, 602 A.2d 988 (1992). "Recklessness is a state of consciousness with reference to the consequences of one's acts. . . . It is more than negligence, more than gross negligence. . . . The state of mind amounting to recklessness may be inferred from conduct. But, in order to infer it, there must be something more than a failure to exercise a reasonable

degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them. . . . Wanton misconduct is reckless misconduct. . . . It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action." (Citations omitted; internal quotation marks omitted.) *Craig* v. *Driscoll*, 64 Conn. App. 699, 720, 781 A.2d 440, cert. granted on other grounds, 258 Conn. 931, 785 A.2d 228 (2001). Whether the defendant acted recklessly is a question of fact subject to the clearly erroneous standard of review. Id., 721.

After our review of the evidence presented, we conclude that the court reasonably inferred that the defendant or its agents acted recklessly in performing the excavation work that damaged the plaintiffs' properties. There was testimony from both parties' experts regarding the steep topography of the boundary area and the precise nature of the encroachments. Ralph Gallagher, a licensed professional engineer, testified that in his observation, prudent excavators made sure they were well aware of adjacent property lines and to stay back. David White, a surveyor, testified that there were drill holes from blasting very close to the boundary lines with both the strip and the parcel. Frank testified similarly. There also was evidence that the defendant was well aware of the location of the boundary at the time of the excavation.

When reviewing the court's findings, "it is well to remember that [triers of fact] are not expected to lay aside matters of common knowledge or their own observation and experience of the affairs of life, but, on the contrary, to apply them to the evidence or facts in hand, to the end that their action may be intelligent and their conclusions correct. . . . [S]ee also *State* v. *Zayas*, 195 Conn. 611, 620, 490 A.2d 68 (1985) ([i]t is an abiding principle of jurisprudence that common sense does not take flight when one enters a courtroom)."

(Internal quotation marks omitted.) *State* v. *Coscuna,* 59 Conn. App. 434, 442–43, 757 A.2d 659 (2000).

We conclude that the court's finding of recklessness was not clearly erroneous; therefore, its award of punitive damages was proper.

**B**

The defendant also claims that the court improperly awarded punitive damages in an amount exceeding the plaintiffs' attorney's fees and costs. The plaintiffs concede that the award was excessive. We agree with the parties that the court's initial punitive damages award of $100,000 was not justified, but note that it subsequently attempted to correct the award. Although the award as corrected is supported by the evidence, we remand the case for a new hearing in damages, limited to the issue of punitive damages, because the court was without jurisdiction to amend its initial award.

The following additional procedural history is relevant. The court's memorandum of decision is dated February 20, 1996. On September 26, 2001, after the parties had instituted this appeal and cross appeal, the court issued a supplemental order regarding attorney's fees and costs. Therein, the court acknowledged that its prior order of $100,000 in punitive damages was improper. It therefore revised that award to $41,797, an amount representing the plaintiffs' attorney's fees and costs. Normally, we would decline to review this issue as moot; however, we address it briefly because although "[a] trial court possesses the power to modify substantively its own judgment within four months succeeding the date on which it was rendered or passed"; (internal quotation marks omitted) *Bottass* v. *Bottass,* 40 Conn. App. 733, 738, 673 A.2d 129 (1996); the court in this case issued its corrective order more than five years after its judgment. Furthermore, it appears that the September 28, 2001 judgment file, signed by the

clerk, is in error insofar as it retains the court's initial punitive damages award of $100,000 and adds on the $41,797 that was intended to replace the initial award.

"The determination of damages involves a question of fact that will not be overturned unless it is clearly erroneous." (Internal quotation marks omitted.) *Lawson* v. *Whitey's Frame Shop*, 241 Conn. 678, 690, 697 A.2d 1137 (1997). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Premier Capital, Inc.* v. *Grossman*, 68 Conn. App. 51, 59, 789 A.2d 565, cert. denied, 260 Conn. 917, 797 A.2d 514 (2002).

In Connecticut, common-law punitive damages are limited to the plaintiffs' litigation expenses plus taxable costs. *Berry* v. *Loiseau*, 223 Conn. 786, 825–27, 614 A.2d 414 (1992). Such damages "serve primarily to compensate the plaintiff for his injuries"; id., 827; but, "when viewed in the light of the increasing costs of litigation, also serves to punish and deter wrongful conduct." Id. Our Supreme Court recently declined to revise that rule, concluding that it "fulfills the salutary purpose of fully compensating a victim for the harm inflicted on him while avoiding the potential for injustice which may result from the exercise of unfettered discretion by a jury." (Internal quotation marks omitted.) Id.

Because the court's initial award of punitive damages of $100,000 was unsupported by the evidence, we conclude that it was clearly erroneous. Because its subsequent attempt to correct that award was untimely and therefore ineffective, a new hearing on punitive damages is necessary.

## V

We turn now to the plaintiffs' cross appeal. In their brief, the plaintiffs make three separate claims that raise essentially the same issue.[8] As such, we address those claims together. The plaintiffs' argument is, inter alia, that the court improperly awarded them damages instead of the injunctive relief that they had requested. We are not convinced.

In their prayer for relief, the plaintiffs requested, in addition to compensatory and punitive damages, that the court order the defendant to restore the lateral support to their properties, and "to eliminate the risk of injury to persons and property" posed by the steep cliffs. The court declined to order restoration of support because the estimated costs of remediation exceeded the value of the property, because repair would require work to be done on the plaintiffs' property and because it would be difficult for the court to supervise. Instead, it awarded the aforementioned compensatory and punitive damages, and ordered the defendant to pay for the installation of a fence on the boundary to "be placed

---

[8] The plaintiffs frame the issues in their cross appeal as follows: "1. Did the trial court err in ordering the plaintiffs to erect a substantial safety fence on their property and thereby bring about a practical confiscation of a twenty-five foot strip of land along the plaintiffs' property lines? . . . 2. Did the trial court err in ordering the plaintiffs to erect a substantial safety fence on their property without requiring the defendant to provide lateral support along the vertical cliff it created? [and] 3. Did the trial court err in denying the plaintiffs' request for mandatory injunctive relief to restore lateral support and instead award compensatory damages?"

We read issues one and two as being substantially identical and, further, subsumed within issue three because it is impossible to erect the fence on the defendant's property, as suggested by the plaintiffs, without first requiring the restoration of lateral support. This is because, as mentioned previously, the current topography of the border area essentially is a sheer cliff and it would make no sense to build a safety fence on the defendant's property at the foot of that cliff. We note also that the plaintiffs provide sparse analysis of the first two claims, do not frame them as legal issues and cite no legal authorities in support of their arguments.

on defendant's property where space allows and upon plaintiffs' property where the excavation so requires." The plaintiffs argue that the court instead should have ordered the defendant to restore the lateral support and then to build a fence entirely on its own property.

"A party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law. . . . A prayer for injunctive relief is addressed to the sound discretion of the court and the court's ruling can be reviewed only for the purpose of determining whether the decision was based on an erroneous statement of law or an abuse of discretion. . . . Therefore, unless the trial court has abused its discretion, or failed to exercise its discretion . . . the trial court's decision must stand." (Citations omitted; internal quotation marks omitted.) *Advest, Inc.* v. *Wachtel*, 235 Conn. 559, 562–63, 668 A.2d 367 (1995).

Generally speaking, "[r]elief by way of mandatory injunction is an extraordinary remedy granted in the sound discretion of the court and only under compelling circumstances. . . . Ordinarily, an injunction will not lie where there is an adequate remedy at law." (Citation omitted; internal quotation marks omitted.) *Monroe* v. *Middlebury Conservation Commission*, 187 Conn. 476, 480, 447 A.2d 1 (1982). "In exercising its discretion, the court, in a proper case, may consider and balance the injury complained of with that which will result from interference by injunction." *Moore* v. *Serafin*, 163 Conn. 1, 6, 301 A.2d 238 (1972). "Where the granting of the injunction would cause damage to the defendant greatly disproportionate to the injury of which the plaintiff complains, it may be held inequitable to grant a mandatory injunction and the plaintiff may be remitted to her remedy by way of damages." Id., 6–7.

"Adjoining owners have a natural right to the lateral support of each other's ground; or, to state it more

exactly, while an adjoining owner has the right to exca-
vate his own ground for any lawful purpose, he must
do so in such manner that his neighbor's land will not,
by its own weight or through the action of the elements,
fall into the excavation." *Carrig* v. *Andrews*, 127 Conn.
403, 405–406, 17 A.2d 520 (1941). If the adjoining owner
"excavates so near the line that his neighbor's soil . . .
is liable to give way, [he] must support it by artificial
means, *or answer in damages* if it falls into the excava-
tion." (Emphasis added.) *Ceffarelli* v. *Landino*, 82
Conn. 126, 129, 72 A. 564 (1909).

In actions for loss of lateral support, courts most
often have awarded damages representing the "diminu-
tion of value of the land, *unless the damage can be
repaired at lesser cost.*" (Emphasis added.) 9 R. Powell,
Real Property (1997) § 702 [2]; see also 1 Am. Jur. 2d,
Adjoining Landowners § 77 (1994). "The general rule
appears to be that the cost of restoration is the correct
measure *where it is less than the diminution in the
value of the property.*" (Emphasis added.) 1 Am. Jur.
2d, supra, § 78. Injunctive relief generally will be denied
"if the court finds that the harm is adequately compensa-
ble in monetary damages." 9 R. Powell, supra, § 702
[3]. Consequently, mandatory injunctions compelling
restoration of lateral support are infrequently issued. Id.

In this case, according to the plaintiffs' own wit-
nesses, the costs of remediation far exceeded the dimi-
nution in the value of the properties. Gallagher, the
licensed professional engineer retained by the plaintiffs
to review the damage and to suggest possible solutions,
testified that in his estimate, it would cost between
$500,000 and $600,000 to restore lateral support using
fill. He testified further that alternatively, for approxi-
mately $1 million, a retaining wall could be built. Addi-
tionally, he stated that some combination of fill and a
less expensive type of wall still would cost $400,000 to
$500,000. John Raabe, a geologist who testified for the

plaintiffs, opined that it would cost $440,000 to construct concrete retaining walls, with an additional 10 percent to 20 percent extra for engineering costs. The court compared these estimates to a damages figure that it derived from crediting the testimony of the plaintiffs' real estate appraiser, Ronald Glendinning.

Considering this evidence, the court applied the majority rule governing remedies in lateral support cases to award damages rather than injunctive relief, reasoning that the costs of remediation greatly exceeded the value of the plaintiffs' property. The damages award adequately compensated the plaintiffs for their injury because it was based on the amount that they likely would have received had they sold the property for residential development, according to the plaintiffs' expert.

Furthermore, two Bethel zoning officials and an engineer testified that after the excavation, it was not possible to erect a fence on the defendant's property that also would be at the top of the slopes. Raabe testified that it would be extremely difficult to perform the drainage aspect of restoring lateral support without entering the plaintiffs' property.

Thus, in awarding monetary damages instead, the court declined to order relief that would have involved the defendant performing work on the plaintiffs' property, possibly leading to further disputes between the parties and embroiling the court in future enforcement issues. "In determining the appropriateness of injunctive relief, the court must give consideration to the practicality of drafting and enforcing the order or judgment. If drafting and enforcing are found to be impracticable, the injunction should not be granted. This is true whether the purpose of the injunction is to restrain a threatened tort or to compel affirmative reparation." 4 Restatement (Second), Torts § 943, comment (a) (1979).

On the basis of the foregoing, we cannot say that the court abused its discretion when it fashioned the relief that it did.

The plaintiffs cite language used by our Supreme Court to describe the balancing process that a trial court should employ to decide whether injunctive relief is appropriate, and, on the basis of that language, argue that because the court found that the defendant recklessly disregarded the plaintiffs' property rights, the court should have ordered the restoration of lateral support, regardless of its cost. See *Bauby* v. *Krasow*, 107 Conn. 109, 115–16, 139 A. 508 (1927). We do not read *Bauby* to so constrain the court's discretion. Although the defendant's wrongful conduct is a factor that the court must consider when balancing the equities of a proposed injunction, it is not necessarily a dispositive one. See 4 Restatement (Second), supra, §§ 936 & 941 comment (b). "That one has an enforceable legal right does not necessarily entitle him to the remedy of an injunction and particularly so when injunctive relief itself would be incompatible with the equities of the case." *Moore* v. *Serafin*, supra, 163 Conn. 8. In this case, the court did not disregard the defendant's wrongful conduct, but awarded the plaintiffs punitive damages because of that conduct.

The plaintiffs' argument that they will be exposed to potential liability if someone were to breach the fence and sustain injuries also is unavailing. "We have long recognized that no court of equity should ever grant an injunction merely because of the fears or apprehensions of the party applying for it, for those fears may exist without any substantial reason." Id., 11.

We conclude that the court acted within its discretion when it denied the injunctive relief requested by the plaintiffs, and instead awarded compensatory and puni-

tive damages and ordering the construction of a fence on the plaintiffs' property.

The judgment is reversed only as to the award of punitive damages and the case is remanded for a new hearing in damages limited to the issue of punitive damages. The judgment is affirmed in all other respects.

In this opinion PETERS, J., concurred.

SCHALLER, J., dissenting. I agree with the assemblage doctrine that the majority has formulated as a matter of first impression. I must respectfully dissent, however, because on the basis of my reading of the trial court's memorandum of decision, I conclude that the case was not decided on the basis of a theory of assemblage analysis.

The court's memorandum of decision is not clear as to the basis for the damages award in favor of the plaintiffs, Frank Franc and Anna Franc, pertaining to both affected parcels.[1] Nonetheless, a close reading of the memorandum of decision reveals that the court determined valuation on the basis of its determination concerning the actual ownership of the parcels. It appears that the court decided, incorrectly in my opinion, that Frank Franc had an ownership interest in both parcels on the basis of a deed "correction" theory. In footnote 1 of the memorandum, the court states: "The [prior owners] conveyed this land (the commercial strip) to coplaintiff Anna Franc. In 1992, after the lateral support litigation had begun, a deed 'corrected' the ownership status so that [the plaintiffs] appear together as

---

[1] The defendant, Bethel Holding Company, filed a motion for articulation of the decision, which the trial court denied. The defendant did not file a motion for review with this court. Although a motion for review would have been a sensible step to take, I cannot say that after the denial of the articulation motion, the defendant was wrong to rely on what appeared to be the trial court's reliance on common ownership of the parcels, albeit mistakenly based on a "deed correction" theory.

owners, as Mr. Franc testified was the original intent, *a claim the court accepts*, consistent as it is with a lifetime of cohabitation and joint endeavors." (Emphasis added.) Aside from that statement, the court does not explain its basis for choosing to value the two parcels, separately owned until four years after the litigation began and eight years after the damage, together for purposes of the damages award.

The uncertainty as to the court's basis of decision that has prompted division within this panel also is shared by the parties to the appeal. It is true that the parties on appeal have raised arguments concerning a possible assemblage theory that they speculate may have been used by the court. Although the parties have *cursorily* addressed assemblage, I believe that it is not appropriate for this court to decide the appeal on the basis of a newly formulated assemblage doctrine because neither the parties nor the trial court had a fair opportunity to address that issue *fully and adequately*. Given the trial court's evident reliance on the status of title to the two affected parcels and a deed "correction" theory, it is not appropriate for us, in essence, to apply *retrospectively* a newly formulated doctrine to the controversy in this case.

From the record, it appears that the damages issue was not tried on the basis of any particular theory of assemblage. Although it is true that the court did use some terms and phrases that might be applicable to an assemblage doctrine, that terminology was not used in the context of an actual assemblage analysis, but rather was a coincidental use of terms and phrases that commonly are used in the context of trials involving real property. Moreover, regardless of the wording used by the court, it is revealing that the court never once used the term "assemblage" in the memorandum when it was using words and phrases that might be applicable to an assemblage theory. Although the court may have

used some assemblage terms, it was not doing so in the context of an assemblage ruling. Moreover, although the majority asserts that the court's valuation rationale is exposed in a colloquy between the court and counsel, as opposed to in the footnote in the *memorandum of decision*, I am not persuaded. Discussion between the court and counsel does not in any way qualify as, or substitute for, findings or legal conclusions of the court that are stated in its memorandum of decision. I conclude, therefore, contrary to the implications in the majority opinion, that the trial court did not make findings and conclusions *in the context of* an assemblage doctrine.

The majority, for example, states that "a trial court, in a case where assemblage analysis is proposed, will best be able to make a determination as to whether a potential integrated use was sufficiently likely to have affected market value by carefully considering *all* of the surrounding circumstances, rather than being constrained by a rigid factor bound approach." (Emphasis in original.) In this case, it cannot be said that assemblage analysis was "proposed" or that the court considered "all of the surrounding circumstances." No findings were made specifically pertaining to assemblage, although the court coincidentally may have considered some of the relevant circumstances, albeit without knowing that it was obligated to consider the assemblage doctrine formulated by the majority.

The majority also states: "A general rule requiring that the proposed assemblage was *reasonably probable* rather than speculative and remote has the advantage of being able to meet both concerns." (Emphasis added.) The term "reasonably probable" was not mentioned in the trial court's memorandum of decision because that standard was not known to the parties or to the court at the time. The majority next states that it will address the trial court's "analysis" but, in my

view, it *superimposes* on the actual analysis of the trial court a *reconstruction* of the "analysis" based on the new assemblage doctrine. The majority states that "[o]ur review of the record convinces us that the court's assemblage approach to valuation was not improper because there was ample evidence to show that the potential integration of the parcel and the strip for the enhanced use as a residential development and an access road thereto was reasonably probable and not speculative or remote." These words and these *findings* were made by the majority, not by the trial court. The trial court made no findings concerning the "reasonable probability" of the integration of the parcel and the strip. The majority adds that "[t]he court thus had a strong basis on which to conclude that it was reasonably probable that [the plaintiffs] would have collaborated on the development of the land had it not been damaged and, further, that there were no regulatory barriers to such development." The trial court did *not* so find or so conclude because, of course, it could not be expected to know what doctrine to apply.

The majority then determines that the court's valuation was not clearly erroneous when, as I have pointed out, its valuation apparently was conducted on the basis of a "corrected" deed ownership theory. As stated previously, the trial court's use of words and phrases that are applicable to trials involving real property generally cannot be imputed to an assemblage theory when the court itself has failed even to use the term "assemblage" in its memorandum of decision or to convey to the parties in the memorandum that it was applying some sort of assemblage doctrine. The case is, in effect, *decided de novo* in this appellate forum on the basis of an assemblage doctrine that has been formulated long after the trial. If, by chance, the parties coincidentally addressed in their briefs some of the pertinent factors pertaining to our new doctrine of assemblage, that is

not a fair substitute for an opportunity to address all the factors. I believe that the fairest resolution would be to remand the case to the trial court for a new trial on the damages issue. At the very least, the parties should be allowed to brief the damages issue on the basis of the trial record as it bears on assemblage doctrine. Although I agree with the assemblage doctrine that the majority has formulated after extensive analysis of Connecticut decisions, numerous sibling state decisions and treatises, I believe that the parties did not have a fair and adequate opportunity to address the issue of what assemblage doctrine should apply.

I acknowledge, given the nature of this case, that the damages award is compelling. Even though liability was conceded and even though substantial damage was inflicted, both parties deserve an opportunity to address fully the issue that will be dispositive. That may not serve *judicial economy* in this situation, but I do not believe that we should decide a case on the basis of an application of a doctrine that was adopted on appeal and not fully addressed by the parties or the trial court. Accordingly, I would reverse the judgment and remand the case for a new trial on the issue of damages. At the very least, the parties should have the opportunity to brief the dispositive issue. For these and other reasons, I respectfully dissent.